FILED
2016 Apr-19  AM 09:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEFF HARRISON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 2:14-cv-01806-JEO** |
| | } | |
| **U.S. PIPE & FOUNDRY,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>REPORT AND RECOMMENATION</u>

This case comes before the court on Defendant U.S. Pipe & Foundry's ("U.S. Pipe") Motion for Summary Judgment. (Doc. 12).  Plaintiff Jeff Harrison ("Harrison") has stated one claim seeking overtime compensation under the Fair Labor Standards Act ("FLSA").   U.S. Pipe argues it is entitled to summary judgment because Harrison's salary and job responsibilities meet the requirements for executive and administration exemption from the FLSA.  The parties have fully briefed the motion and submitted evidentiary support (docs. 13, 15, 19, 20, 22), and the court has thoroughly reviewed the parties' submissions.  For the reasons stated below, the court finds that U.S. Pipe's motion for summary judgment is due to be denied.

## I.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party.  *Hill v. Wal-Mart Stores, Inc.*, 510 F. App'x 810, 813 (11th Cir. 2013).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## II.     PROCEDURAL AND FACTUAL BACKGROUND[1]

U.S. Pipe manufactures and sells pipe across the United States.  (Doc. 13-3 ¶ 4).  U.S. Pipe has a campus in Bessemer, Alabama, that includes two separate pipe mills: one that makes large diameter pipe (the "main mill") and one that makes small diameter pipe (the "Mini Mill").  (Doc. 13-3 ¶ 5).  Harrison began his

---

[1] Consistent with the summary judgment standard, the court presents the facts in the light most favorable to the plaintiff.

employment with U.S. Pipe on August 15, 2012, as the Quality Assurance Engineer ("QA Engineer") for the Mini Mill.  (Doc. 13-1 p. 29[2]).  Harrison resigned from the position in December 2012, but he applied for and then returned to the position on January 28, 2013.  (Doc. 13-1 pp. 63-65, 71, DX 5 & 7). Harrison again resigned effective July 31, 2014.  (Doc. 13-1 pp. 139-40, DX 20).

### A.   Chain of Command

Harrison reported to Eric Vaughn ("Vaughn"), the Manager of Quality Control for the entire Bessemer campus.  (Doc. 13-1 p. 53; Doc. 13-2 p. 22). Vaughn reports to Russ Huggins ("Huggins"), the Associate Vice President, Product Development and Quality.  (Doc. 13-2 p. 16).  Vaughn and Huggins have offices in the technical services building near the main mill.  (Doc. 13-3 ¶11; Doc. 13-2 p. 48).

Huggins testified during his deposition that he tried to go to the Mini Mill once a week for a full tour lasting approximately 45 minutes each time.  (Doc. 13-2 p. 48).  Huggins stated in his subsequent affidavit that he and Vaughn "usually visited the Mini Mill . . . once or twice a week."  (Doc. 13-2 ¶ 12).  Vaughn testified that he "check[ed] in on the Mini Mill daily" through emails, phone calls, but "[m]ostly visits."  (Doc. 20-1 p. 10).

---

[2] Deposition page references are to the transcript page numbers, not the Clerk's electronically assigned numbers located at the top of the exhibits.

### B.    Mini Mill Operations

The Mini Mill manufactures small diameter pipe.  (Doc. 13-3 ¶ 5).  After pipe is manufactured, it moves down a conveyor belt system into the Quality Control Department ("QC Department").  (Doc. 13-3 ¶ 13).  QC Department employees inspect the pipe to ensure that it meets various industry, company, and customer standards.  (Doc. 13-3 ¶ 14).

The Mini Mill has two shifts, each staffed with the following QC Department employees: a lead man, lab technician, bell inspector, spigot inspector, transfer car operator, and bell grinder.  (Doc. 13-1 pp. 29, 34; Doc. 13-2 p. 19, 21).  During the first shift, the QC Department also has a shipping lead man and a shipping inspector.  (Doc. 13-2 p. 21).  Harrison worked during the first shift, and he was the only QA Engineer for the Mini Mill.  (Doc. 13-1 p. 114, 130; Doc. 20-3 ¶ 15).

### C.    Harrison's Job Responsibilities

As QA Engineer, U.S. Pipe asserts that Harrison was in charge of the QC Department.  (Doc. 13-3 ¶ 19).  Harrison disputes that assertion and says instead that Vaughn, as the Manager of Quality Control for the entire Bessemer campus, was in charge of the QC Department.  (Doc. 20-1 p. 9; Doc. 20-2).  Harrison did admit that he supervised the QC Department within the Mini Mill. (Doc. 13-1 pp. 31-32).

4

Harrison's job description in his offer of employment identified his essential job functions as "planning, organizing, directing and providing for the supervision of all functions of the Fabricated Products and Quality Control Departments so as to ensure that products meet or exceed quality, industry, national and/or international standards and specifications and are provided according to customer requirements." (Doc. 13-1 DX 3). In fact, Harrison's resume recites verbatim this entire job description for his experience as QA Engineer with U.S. Pipe.[3] (Doc. 13-1, DX 1). Of the enumerated essential job functions, Harrison testified that he actually did only some of them. (Doc. 13-1 pp. 30-32). He testified that the planning and organizing was more the role of the planning department, plant manager, and sales team, all of whom determined what product to make and when.

---

[3] His resume also lists the following additional job functions:

- ISO 9001 Management Representative for Marvel City Plant
- Responsible for the establishment of objectives that are consistent with Company and Corporate objectives; the development and implementation of a plan to meet the objectives
- Creates and directs the development of quality management system procedures and work instructions
- Issues and monitors non-conformance reports for both product and processes
- Organize on-site customer, vendor and inspector visits
- Direct workforce to ensure fabricated products meet customer requirements
- Conduct periodic inspections/audits of the processes so as to insure products comply with job specifications and quality control standards

(Doc. 13-1, DX 1). Vaughn actually served as the ISO 9000 representative for the Mini Mill, though Harrison's offer of employment indicated he was to serve in that capacity. (Doc. 13-1 pp. 58-59, DX 3; *see also* Doc. 20-1 pp. 10-11).

5

(*Id*. p. 30).   He testified that the Fabricated Products Department work was originally part of quality control but was moved to another department 6-8 months into his employment.   (*Id*. p. 31).   He also testified that his supervision responsibilities were limited to the QC Department at the Mini Mill, not the entire Bessemer campus.   (*Id*. pp. 31-32).   He did not deny being responsible for "directing and providing for the supervision of all functions of the Quality Control Department [in the Mini Mill] so as to ensure that products meet or exceed quality, industry, national, and/or international standards and specifications and are provided according to customer requirements."

Huggins testified that Harrison "had supervisory functions over the quality department" at the Mini Mill, meaning Harrison supervised the three lead men who supervised their respective quality control employees. (Doc. 13-2 pp. 69-61). Huggins summarized Harrison's other general job duties as "to make sure the [QC Department] was staffed, make sure they were trained, make sure they were doing their quality control functions.   His additional job duties were quality engineering functions, such as continuous improvement, statistical analysis, auditing, project work, cost reduction work, complaint analysis through cause analysis."   (*Id*. pp. 61-62).   As discussed in more detail below, Harrison denies having responsibility for staffing and training.

6

U.S Pipe expected Harrison to regularly attend meetings with his superiors and other managers about pipe quality issues throughout the Mini Mill. (Doc. 13-3 ¶ 43). Harrison stated, "U.S. Pipe had monthly safety meetings where safety department employees, all production employees and managers would attend. I however only attended one or two of these meetings." (Doc. 20-3 ¶ 17).

Harrison handled customer complaints. (Doc. 13-1 p. 83). When the Mini Mill received a complaint, he would investigate the return of the pipe, would assist in the testing or inspection of the returned pipe, and then would generate a document in the complaint system that listed the results of the testing or inspection. (*Id*. p. 83). He very rarely spoke directly with customers about complaints; conversations typically were handled by the sales and marketing representatives. (*Id*. p. 84; *see, e.g.*, Doc. 13-1 DX 12). If he did speak directly to the customer, it was to get clarification about the problem or in the event of a customer visit to the facility to witness the testing. (Doc. 13-1 p. 84).

At Vaughn's request, Harrison also conducted an internal audit of the processes and procedures used by the main mill. (Doc. 13-1 pp. 91-93, DX 14). There are certain documents, procedures, and forms that instruct employees on how to perform their duties. (Doc. 13-1 p. 92). Harrison's job during an audit was to verify that the employees were following those procedures. (*Id*. p. 92). He also

would verify that the instrumentation being used was operational and calibrated properly. (*Id*. p. 92).

At the plant manager's request, Harrison and the other Mini Mill supervisors put together a quality plan for the production of hydrant pipe; the plan included a page of standards and instructions for each department within the plant. (Doc. 13-1 pp. 97-100, DX 15). Harrison had the responsibility of putting together the specifications from the plant manager (who received the information from a customer or from the applicable standards) into one table and then dispersing the plan to each department for reference. (*Id.*)

Harrison created at least one "work instruction" while with U.S. Pipe. (*Id*. p. 37). To do so, he compiled the existing standards and the stated company procedure for how to test a pipe using ultrasonic equipment, which were difficult for the QC Department employees to follow and implement in the thirty seconds they had between pipes in the manufacturing environment. (*Id*. pp. 37-39). Harrison created a table that the employees could quickly consult to determine whether the pipe was within acceptable parameters (set by the company and the industry standards). (*Id*. pp. 38-39). The QC Department had a weekly safety meeting with the department employees, and Harrison trained everyone to use his "work instruction" at one such meeting. (*Id*. pp. 39-40).

Harrison worked on at least one "cost saving project" as well.  (*Id*. p. 106).
He reformatted the end process label to reduce its size, which according to U.S.
Pipe was going to save $1,200 per month in label costs not including a 40%
reduction in ribbon usage.  (*Id*. pp. 106-07, DX 16).  To Harrison's knowledge, his
proposed plan was never implemented.  (*Id*. pp. 106-07).

Harrison, in collaboration with the production leads and representatives from
the safety and other departments, also created a safety assessment after an
employee who was temporarily assigned to work in the QC Department suffered
an eye injury.  The assessment described and evaluated what happened to cause the
employee's injury and made recommendations for how to prevent injury in the
future.  (*Id*. pp. 77-81, DX 10).

When QC Department employees identified a pipe defect, U.S. Pipe relied
on Harrison to address the problem.  (Doc. 13-3 ¶ 30).  Harrison was responsible
for making the decision about whether to salvage or scrap pipe in "close call"
quality control situations; Harrison asserts that he would pass his thoughts along to
Vaughn, who would make the final decision.  (*Id*. ¶ 31; Doc. 20-3 ¶¶ 32-33; *but see*
Doc. 20-3 ¶ 39 ("[W]hen making decisions on whether to salvage or scrap product,
I simply followed accepted company and industry standards when making the final
decision.")).   According to U.S. Pipe, salvaging pipe saves the company
approximately $500 per ton, but if that salvaged pipe should have been scrapped, it

can ultimately cost the company upwards of $500,000 to remedy. (Doc. 13-3 ¶ 31).

Harrison did not have the authority to hire or fire employees. (Doc. 13-1 p. 120). He did request additional personnel for the QC Department during the production of the hydrant pipe, and the plant moved existing personnel around to accommodate his request. (*Id*. pp. 75-76). He discussed one employee's poor job performance with Vaughn and HR, but he did not have the authority to terminate her employment despite his desire to do so. (Doc. 20-3 ¶ 43). He was involved in the promotion of one QC Department employee who bid on a job opening; HR consulted with Harrison to determine whether Harrison deemed the applicant qualified. (Doc. 13-2 p. 57). HR had the final authority to decide whether to promote the applicant, but according to Huggins, "HR would not promote somebody just because they put their name in the hat without [Harrison's] input that they were qualified." (*Id.* pp. 55-57).

Harrison also testified that he was required on numerous occasions to work after hours, without overtime compensation, performing non-managerial tasks. For example, he was required to stay late to personally inspect defective pipe or pipe returned by a customer because of problems. (Doc. 13-1 pp. 121-27).

Harrison did not initiate discipline for employees; QC Department lead men would recommend discipline and he would simply pass along their

recommendations to HR, who would issue disciplinary actions. (*Id*. pp. 44-47). Harrison would deliver disciplinary action write-ups from HR to employees within the QC Department and discuss the issues with that employee. (*Id*. pp. 47-53, DX 7) . Harrison rarely evaluated employees' job performance. (Doc. 20-3 ¶ 24).

Harrison did not assist in planning the budget for the QC Department. (*Id*. ¶ 26). He did not implement safety measures for the QC Department. (*Id*. ¶ 25). He spent very little, if any, time training employees. (*Id*. ¶ 22). He did not determine which employees would be sent home in the event of a mechanical problem; the Plant Manager made those decisions. (Doc. 13-1 pp. 43-44).

Harrison followed company policy and industry standards in performing his job functions. (Doc. 20-3 ¶ 33). He did not have the authority to deviate from established policies and procedures, to formulate management policies or operating practices, or to negotiate or bind U.S. Pipe in significant matters. (*Id*. ¶¶ 32-39).

### D.    Harrison's Salary and Request for Overtime Compensation

Harrison's salary was $6,784 per month (over $80,000 annually). His salary was not subject to reductions because of variations in the quality or quantity of the work performed. (Doc. 13-3 ¶¶ 7-8). According to Harrison, he worked an average of 10-20 hours per week without being compensated for overtime. (Doc. 20-3 ¶ 40). According to Harrison, several other salaried employees at the Mini Mill received compensation for their overtime hours. (Doc. 13-1 pp. 127-29).

11

Harrison spoke with management about receiving overtime compensation as well, but his request was never granted.  (*Id.*)

### E.    Complaint

Harrison resigned from his position as QA Engineer effective July 31, 2014. (Doc. 13-1 pp. 139-40, DX 20).  On September 23, 2014, Harrison filed suit in this court asserting one claim for overtime compensation allegedly owed pursuant to the FLSA.  (Doc. 1).

## III.    ANALYSIS

U.S. Pipe argues that it properly classified Harrison as exempt during his employment as QA Engineer and, therefore, he is not entitled to overtime compensation under the FLSA.  The FLSA exempts from its minimum wage and overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).  U.S. Pipe asserts that Harrison meets the salary and responsibility requirements for both the executive and administrative exemptions.   Alternatively, U.S. Pipe argues that Harrison's responsibilities fall into the combination exemption.  Harrison does not dispute that he meets the salary requirements, so the court will focus its analysis on the other requirements for the exemptions asserted by U.S. Pipe.

## A.   Executive Exemption

U.S. Pipe argues that Harrison's duties as QA Engineer meet the requirements for the executive exemption.  An exempt executive is one who (1) has the "primary duty" of "management of the enterprise . . . or of a customarily recognized department or subdivision thereof," (2) regularly directs the work of two or more employees, and (3) has "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."   29 C.F.R. § 541.100(a).   The employer has the burden of showing entitlement to an exemption, and courts in the Eleventh Circuit construe overtime exemptions narrowly against the employer.  *Barreto v. Davie Marketplace, L.L.C.*, 331 F. App'x 672, 674 (11th Cir. 2009).[4]  The Eleventh Circuit has recognized the "Supreme Court's admonition that courts closely circumscribe the FLSA's exceptions."  *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997).  The executive exemption "is to be applied only to those clearly and unmistakably within the terms and spirit of the exemption."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008).

---

[4] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, the may be cited as persuasive authority.  11th Cir. R. 36-2.

### 1.   Element one – primary duty of management.

U.S. Pipe argues that Harrison's primary duty as QA Engineer was management of the Mini Mill QC Department.  An employee's primary duty is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).  In applying this definition, courts look to the aspect of the employee's job that is "'of principal value to the employer, not the collateral tasks that [he] may also perform, even if they consume more than half [his] time.'" *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir.1990)).  "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700(a).

The evidence demonstrates that Harrison had at least some oversight from his superiors.  Huggins visited the Mini Mill for a 45-minute tour approximately once or twice a week.  Vaughn checked in daily, through phone calls, emails, or visits – mostly visits.  Evidence that Harrison had final say as to "close call" scrap or salvage decisions is contradicted by other evidence that he only made initial

14

recommendations to be reviewed by Vaughn.  Harrison testified that any decisions he made were based upon company policies, industry standards, and client specifications, not his own independent judgment, and that he had very little (if any) leeway to deviate from the set policies and standards.

As for U.S. Pipe's argument that Harrison was the manager of the QC Department at the Mini Mill, Harrison argues that his title was QA Engineer, not QA Supervisor, and that Vaughn had managerial responsibility for the entire QC Department at the Bessemer campus.  "A job title alone is insufficient to establish the exempt status of an employee."  29 C.F.R. § 541.2.  Harrison did testify that he supervised the Mini Mill QC Department employees.

Generally speaking, "management of . . . a customarily recognized department or subdivision" includes activities such as interviewing, selecting, and *training employees*; setting and adjusting rates of pay and hours of work; *directing the work of employees*; maintaining production or sales records for use in supervision or control; *appraising employee productivity for the purpose of recommending promotions*; handling employee grievances; *disciplining employees*; planning the work; determining the equipment or tools to be used; controlling the flow and distribution of materials or supplies; *providing for the safety and security of the employees or the property*; planning and controlling the budget; and *monitoring or implementing legal compliance measures*.  29 C.F.R. § 541.102.

15

U.S. Pipe presented evidence that Harrison is responsible for a number of these activities.

U.S. Pipe asserts that Harrison was responsible for training and/or ensuring that the Mini Mill QC Department employees were trained. Harrison denies that he was responsible for training. Harrison admits to only one episode of training, when he presented a new "work instruction" to the QC Department employees to clarify and expedite their use of ultrasonic testing devices.

U.S. Pipe asserts that Harrison directed the work of other employees, including the three lead men under his direct supervision, the other QC Department employees under his indirect supervision, and the employees from other departments who assisted Harrison with various safety, quality, and process assessment projects. U.S. Pipe also references the "work instruction" Harrison developed as evidence that he directed the work of QC Department employees. Harrison does not dispute that he supervised the Mini Mill QC Department but argues that he merely ensured compliance with policies handed down to him from his superiors and that he had no authority to deviate from those policies or formulate new policies.

U.S. Pipe asserts that Harrison gave his recommendation for promotion when a QC Department employee bid for the position. According to U.S. Pipe, HR would not have promoted the employee without Harrison's recommendation.

16

Harrison argues that the employee was the only applicant for the position and that evaluating employee performance (for any purpose) was not part of his regular job duties.

U.S. Pipe asserts that Harrison disciplined employees in the QC Department and signed their disciplinary action forms.  Harrison denies that he disciplined employees; he asserts that the lead men would sometimes recommend disciplinary action to HR, that HR issued disciplinary actions, and that he only delivered and discussed the disciplinary actions with the employees.

U.S. Pipe asserts that Harrison was responsible for the safety of employees and the property.  Harrison testified that the QC Department held weekly safety meetings on Monday.  U.S. Pipe also points to Harrison's involvement in the safety assessment following an employee's eye injury and his participation in regular safety meetings with other managers.  Harrison concedes that he was involved in the safety assessment but denies that he ever attended (or attended more than once or twice) any safety meetings.

One of Harrison's main job functions was to monitor compliance with company policies, industry standards, and customer specifications.  As part of this duty, he supervised Mini Mill QC Department employees, he developed and implemented work instructions to improve quality procedures, he conducted an

internal audit of the quality procedures at the main mill, and he addressed customer complaints about defects in pipe quality.

On the flip side, the undisputed evidence demonstrates that Harrison did not interview or select employees, set or adjust rates of pay and hours of work, handle employee grievances, or plan and control the budget. Harrison also testified that he performed indisputably non-managerial duties, such as actually inspecting pipe himself to relieve other employees or after hours.

According to Huggins, U.S. Pipe's 30(b)(6) representative, Harrison's managerial duties were significantly more important to U.S Pipe than any non-managerial duties he may have performed. (Doc. 13-3 ¶ 51). U.S. Pipe particularly valued Harrison's quality assurance oversight of the Mini Mill's QC Department: ensuring that products met the requisite specifications (and addressing any quality, equipment, or safety issues that hindered that result), investigating customer complaints about product quality, and making decisions about whether "close call" product would be scrapped or salvaged. Quality assurance is, undisputedly, a critical component of U.S. Pipe's overall business operations.

In comparison to employees who regularly performed non-managerial inspection work, Harrison's salary was much higher. QC Department employees below Harrison made between $15.85 and $17.16 per hour, which would total less

than half of Harrison's annual salary of more than $80,000.  (Doc. 13-3 ¶ 34, Ex. A).

In short, much of the material evidence is disputed.  This court cannot determine, as a matter of law, whether U.S. Pipe has proven the first element, because that determination hinges on a weighing of the evidence.

### 2. Element two – regularly directs the work of two or more employees.

U.S. Pipe has presented sufficient evidence to establish the second element. Harrison admitted that he supervised the QC Department at the Mini Mill. Harrison directly supervised three full-time lead men, who in turn had direct supervisory authority over the other Mini Mill QC Department employees. In total, Harrison had direct or indirect supervisory authority over approximately 14 employees.

### 3. Element three - authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

Factual disputes remain as to the third element.  It is undisputed that Harrison did not have the authority to hire, fire, or promote employee.  However, U.S. Pipe argues that Harrison's personnel recommendations as to whom to promote were given particular weight.  To determine whether an employee's suggestions were given "particular weight," courts consider such factors as

whether it is part of the employee's job duties to make such recommendations and the frequency with which recommendations are relied upon.  29 C.F.R. § 541.105.

As far as the evidence presented shows, only one employee applied for promotion during Harrison's employment as QA Engineer.  After the employee bid on the position, HR sought Harrison's recommendation. U.S. Pipe asserts that HR would not have promoted the employee without Harrison's recommendation. However, Harrison argues that the employee he recommended was the only one who applied for the job.  Harrison further asserts that evaluating coworkers (to recommend for promotions or otherwise) was not part of his regular job duties.

U.S. Pipe also presented evidence that Harrison recommended that additional personnel be hired for the QC Department during the hydrant pipe project.  No additional staff were hired, but HR did grant Harrison's request by reassigning two employees to work in the QC Department during that project.

Harrison presented evidence that he had no authority to terminate employees and that his recommendations for termination were not given particular weight.  He raised one QC Department employee's poor performance with Vaughn and HR numerous times and expressed his desire to fire her; however, he had no power to terminate her employment and HR did not terminate her.

Assuming Harrison's version of the facts to be true, as the court must at this stage, the court is unable to conclude as a matter of law that Harrison's few

recommendations as to hiring, firing, or promotion were given particular weight. *Cf. Bacon v. Eaton Corp.*, 565 F. App'x 437, 440-41 (6th Cir. 2014) (reversing a summary judgment decision where the plaintiffs worked in supervisory positions but the evidence was not clear as to whether their recommendations as to hiring, firing, and promotions were given particular weight by their employer).

In sum, genuine issues of material fact remain and a jury is needed to weight the evidence.  U.S. Pipe has not shown Harrison to be "clearly and unmistakably within the terms and spirit of the exemption."  *Morgan*, 551 F.3d at 1269.  U.S. Pipe, therefore, is not entitled to summary judgment as to its argument that Harrison is exempt under the executive exemption from the FLSA's requirements.

## B.    Administrative Exemption

U.S. Pipe argues that Harrison's duties as QA Engineer meet the requirements for the administrative exemption.  The administrative exemption applies to an employee (1) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (2) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a); *Adams v. BSI Mgmt. Sys. Am., Inc.*, 523 F. App'x 658, 660 (11th Cir. 2013).  Again, the employer has

the burden of showing entitlement to an exemption and courts in the Eleventh Circuit narrowly construe FLSA exemptions.  *Adams*, 523 F. App'x at 660.

**1. Element one – office or non-manual work directly related to the management or general business operations of the employer or the employer's customers.**

The evidence demonstrates that Harrison's primary duties were the performance of office or non-manual work, satisfying the first part of element one. Harrison had supervisory authority over the Mini Mill's QC Department, including direct supervision of the three lead men and indirect supervision over the employees under the lead men.  He conducted an internal audit of the processes and procedures used by the main mill, verifying that employees were following procedures and that instruments in use were operational and calibrated properly. He compiled a "quality plan" for the production of hydrant pipe that included a reference page of specifications and instructions for each department within the Mini Mill.  He handled the investigation of customer complaints, including testing and reporting of test results.  He created at least one "work instruction" for the Mini Mill QC Department, which compiled and clarified the applicable standards for ultrasonic testing in a way that was easier for the quality technicians to use on the line.  He worked on at least one cost saving project as well, developing a new and smaller end process label; to Harrison's knowledge, his proposed label design was never actually used.   In collaboration with representatives from other

departments, after an employee in the QC Department injured herself, he created a safety assessment and recommendations for how to prevent another injury. Harrison was also responsible for deciding whether to scrap or salvage pipes when the quality testing resulted in a "close call."  Harrison did help with quality testing alongside (and sometimes in place of) his subordinates, but the record does not reveal this function to be his primary duty.  Thus, the first part of element one is met.

To meet the second part of element one, Harrison's office/non-manual work must have been directly related to management or general business operations. The regulations provide an illustrative, but not exclusive, list of work that is directly related to management or general business operations: "work in functional areas such as tax; finance; accounting; budgeting; *auditing*; insurance; *quality control*; purchasing; procurement; advertising; marketing; research; *safety* and health; *personnel management*; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; *legal and regulatory compliance*; and similar activities." 29 C.F.R. § 541.201(b) (emphasis added).

As recounted above, Harrison's primary job duties included many of those listed in the regulations' illustrative list: auditing, quality control, safety, legal and regulatory compliance, and some personnel management.  This case is analogous

to *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349 (5th Cir. 2015).  In *Zannikos*, the plaintiffs were marine superintendents whose responsibilities included tasks similar to Harrison's: observing oil transfers to verify that performance was accurate, legal, and safe; monitoring the loading and unloading of cargo and reporting any errors or losses; monitoring and reporting on compliance with company regulations and industry standards; inspecting equipment to identify problems with safety or calibration; and recommending remedial measures to personnel or the company.  605 F. App'x at 351.  The plaintiffs in *Zannikos*, like Harrison, performed some production labor, but that work was not their primary duty.  *Id.*  Just as in *Zannikos*, the court finds that Harrison's primary duties were administrative in nature, i.e. they primarily involved office or non-manual work directly related to the management or general business operations of U.S. Pipe.  In sum, the evidence demonstrates that Harrison's job responsibilities meet the requirements for element one of the administrative exemption.

2.  **Element two – exercise of discretion and independent judgment with respect to matters of significance.**

The regulations define "the exercise of discretion and independent judgment" as involving "the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," which "implies that the employee has authority to make an independent choice, free from immediate direction or supervision."  29 C.F.R. §

541.202(a), (c).   As discussed below, there are factual disputes as to whether Harrison exercised discretion and independent judgment with respect to matters of significance.

"An employee who leads a team of other employees assigned to complete major projects for the employer (such as . . . designing and implementing productive improvements) generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team."   29 C.F.R. § 541.203(c). The undisputed evidence demonstrates that Harrison lead a number of teams assigned to assess productive improvements for U.S. Pipe: a quality plan for hydrant pipe, a work instruction for testing with ultrasonic equipment, redesign of the end process label to reduce costs, a safety assessment evaluating what caused an injury and how to prevent future injury, and oversight of customer complaints. This evidence weighs in favor of finding that Harrison meets the requirements for the administrative exemption.

Moreover, the regulations note that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."   29 C.F.R. § 541.202(c).   The evidence shows, for example, that Harrison made the decision about whether pipe that had tested at a quality too close to call should be scrapped or salvaged.   Evidence that his decisions were

merely initial recommendations subject to Vaughn's final review, if true, would not necessarily weight against element two.

Nevertheless, an employee's discretionary powers must be "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources" to satisfy the second element.  29 C.F.R. § 541.202(e).  Harrison stated that he followed company police and industry standards in performing his job functions and that he did not have the authority to deviate from established policies and procedures, to formulate management policies, or to devise operational practices.  Indeed, the evidence indicates that at least some of Harrison's primary duties are strikingly similar to those of inspectors, examiners, and grades, all of whom are generally non-exempt employees.  *See* 29 C.F.R. § 541.203(g)-(j).  "Such employees usually perform work involving the comparison of products with established standards which are frequently catalogued."  29 C.F.R. § 541.203(h); *see also* 29 C.F.R. § 541.203(g).  They "gather[] factual information, apply[] known standards or prescribed procedures, determin[e] which procedure to follow, [and] determin[e] whether the prescribed standards or criteria are met."  29 C.F.R. § 541.203(j).

To satisfy element two, an employee must not only exercise independent judgment, but that judgment must be as to a "significant matter."  U.S. Pipe presented evidence that Harrison was responsible for making "close call" decisions

26

about whether to salvage or scrap product, a decision which according to U.S. Pipe could either save it $500 per ton or cost it upwards of $500,000 to remedy. Harrison disagrees, asserting that Vaughn actually had the authority to make a final decision whether to salvage or scrap product.  U.S. Pipe also presented evidence that Harrison was responsible for investigating, identifying, and resolving customer complaints in a way that minimized financial risk to the company and preserved that business relationship moving forward.  Harrison does not dispute that fact. Regardless, a matter is not significant merely because the employer will experience financial losses if the employee fails to perform the job properly, such as where a messenger is trusted with carrying large sums of money or where an operator on the line works with very expensive equipment.  29 C.F.R. § 541.202(f).

In short, factual disputes remain as to Harrison's freedom from supervision, as to his ability to exercise discretion and independent judgment as opposed to merely applying policies and standards, and as to the significance of Harrison's decision-making duties.   A jury must weigh the evidence and decide these questions of fact. U.S. Pipe has not shown Harrison to be "clearly and unmistakably within the terms and spirit of the exemption." *Morgan*, 551 F.3d at 1269.  U.S. Pipe, therefore, is not entitled to summary judgment as to its argument that Harrison is exempt under the administrative exemption from the FLSA's requirements.

### C.      Combination Exemption

U.S. Pipe argues that even if Harrison does not fall entirely within either the executive or administrative exemptions, his claim still fails because the "combination exemption" applies.  "[F]or example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption."  29 C.F.R. § 541.708.  This exemption focuses solely on the employee's job duties; it "addresses the situation that exists when an employee does not meet the primary-duty requirement of any individual exemption.  In such cases, an employee may nonetheless be exempt . . . pursuant to the combination exemption."  *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007) (deferring to the analysis proffered by the Secretary of Labor in her amicus brief).  In other words, this exemption "provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *Id.*  The Fourth Circuit went on to say:

> Although the combination exemption permits the blending of exempt duties for purposes of defining an employee's primary duty, it does not, according to the Secretary, relieve employers of their burden to independently establish the other requirements of each exemption whose duties are combined. . . .  In the Secretary's view, then, the combination exemption cannot apply to an employee with administrative job functions constituting part of her "primary duty" unless the employee also meets the administrative exemption's salary requirement.

*Id.* (internal citations omitted).

28

As discussed above in the sections on the executive and administrative exemptions, factual disputes remain as to what Harrison's primary duties were. Additionally, factual disputes remain as to the other required elements (besides primary duty) of the executive exemption. In other words, the court cannot determine at this point whether the combination exemption is viable.

## IV.   CONCLUSION

Factual disputes predominate the key issues in this case. As such, summary judgment is not proper. U.S. Pipe's motion for summary judgment (doc. 12) is, therefore, due to be **DENIED**. It is so recommended.

## <u>Notice of Right to Object</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal except for plain error. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

**DONE,** this the 19th day of April, 2016.

_John E. Ott_

_____

**JOHN E. OTT**
Chief United States Magistrate Judge